

SO ORDERED,

**Judge Katharine M. Samson**
**United States Bankruptcy Judge**
**Date Signed: August 26, 2014**

**The Order of the Court is set forth below. The docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:  STEPHEN F. BROADUS | CASE NO. 12-52517

DEBTOR | CHAPTER 7

MARIANO J. BARVIÉ | PLAINTIFF

V. | ADV. NO. 13-05002

STEPHEN F. BROADUS | DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter came before the Court for trial on May 5 and 6, 2014, (the "Trial") on the Amended Complaint Objecting to Dischargeability of a Debt, (Adv. Dkt. No. 63), filed by creditor-plaintiff Mariano J. Barvié ("Barvié"), and the Answer to Complaint, (Adv. Dkt. No. 65), filed by debtor-defendant Stephen F. Broadus ("Broadus"). At Trial, Robert Schwartz represented Barvié and George Healey represented Broadus. The parties introduced 42 exhibits by stipulation.[1] Exhibits D-6, D-7, D-8, and D-9 were admitted over objection and the Court sustained Broadus's relevance objections to exhibits P-15 and P-16 prior to trial, (Adv. Dkt. No.

---

[1]Those exhibits include P-1–P-14 and P-17, submitted by Barvié and D-1–D-5, D-10–D-21, and D-23–32, submitted by Broadus.

160).[2] The exhibits and the testimony were the only evidence presented at Trial.[3] Having considered the evidence, the Court finds that the obligation is non-dischargeable in part for the reasons set forth below.[4]

## I. JURISDICTION

The Court has jurisdiction of the parties to and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (I).

## II. FINDINGS OF FACT

### A.   The 2006 Promissory Note and Security Agreement

Broadus filed for relief under Chapter 7 of the Bankruptcy Code[5] on December 10, 2012. In June of 2006, Broadus obtained a loan from Barvié—an attorney who was close friends with Broadus at the time—in the amount of $325,000.000, which was to be repaid in full at an interest rate of 8% per year by January 30, 2007. (Exh. P-7).[6] Broadus used the loan to purchase a leasehold interest in a gas station located at the corner of Pass Road and Ford Street in Gulfport, Mississippi (the "gas station"). (*Id.*). He formed Broadus Petroleum to purchase the interest in the gas station, and the promissory note and security agreement name both Broadus Petroleum

---

[2] Barvié filed a Motion to Amend the pre-trial order, seeking admittance of an additional exhibit into evidence. (Adv. Dkt. No. 162). Broadus opposed the admission of the additional exhibit. (Adv. Dkt. No. 164). At the trial, the Court denied Barvié's motion and accordingly disallowed the admission of the additional exhibit. (Adv. Dkt. No. 169).

[3] The deposition of William E. Whitfield ("Whitfield") was admitted into evidence in its entirety by stipulation of the parties in lieu of having  Whitfield appear and testify at trial.

[4] Pursuant to Federal Rule of Civil Procedure 52, made applicable to this Adversary by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

[5] "Bankruptcy Code" or "Code" refers to the United States Bankruptcy Code located at Title 11 of the United States Code. All Code sections hereinafter will refer to the Bankruptcy Code unless noted otherwise.

[6] Barvié testified that, prior to the loan, his only business dealings with Broadus involved purchasing a vehicle and leasing a rental home from him.

and Stephen Broadus individually as borrower. (*Id.*).

Based on the testimony of Broadus and Barvié, it appears the loan was originally intended as a gap loan to cover Broadus until he could obtain a long-term loan from a bank. Broadus testified that he was informed by a local banker that he would need 12-24 months of profit and asset history to qualify for a loan. He also testified that he had about two-thirds of the money he needed to obtain the leasehold interest when he approached Barvié, but he asked to borrow the full purchase price because he had to pay for inventory. To secure the loan, Broadus pledged the "Inventory and Goodwill owned by Broadus Petroleum for the [gas station]." (*Id.*). Barvié testified that he drafted the note and agreement, which he gave to Broadus in person. He also testified that Broadus took the documents with him for a period of time before returning to Barvié's office to sign them.

After the note and security agreement were executed, Broadus made all of the monthly cash payments in accordance with the terms of the note. But when the balloon payment came due in January of 2007, Broadus asked Barvié for additional time to pay off the note. Barvié agreed to extend the maturity date of the note and Broadus continued making monthly payments throughout 2007 and 2008. In 2009, Broadus asked to skip a few payments and Barvié again agreed to accommodate him. Broadus did not make any payments from March through May of 2009, and he made reduced payments from June to December of 2009.[7] Broadus resumed full payments in January of 2010. (Exh. D-1).

## B.   The 2010 Renewal

On August 3, 2010, the parties executed another promissory note and security agreement (the "2010 Renewal"). (Exhs. P-1, P-2). No new money was advanced by Barvié, and the terms

---

[7] (Exh. D-1). The agreed monthly payment was $2,718.00. Broadus made monthly payments of $2,000.00 from June to December. (*Id.*).

of the note and security agreement mirrored the previous documents. (*Id.*). The loan amount on the 2010 note was $297,628.64. (Exh. P-1). Barvié testified that he and Broadus met at Barvié's office and went over Broadus's payment history to arrive at the new loan amount. The interest rate remained at 8% per year and the monthly payments were to be $2,656.05 with a balloon payment due on October 1, 2010. (*Id.*). Broadus was still attempting to secure financing with a bank and was also expecting to receive money from the settlement of a claim he had against BP related to the Deepwater Horizon oil spill (the "BP claim"). Broadus testified that he knew he did not have the assets to get a loan from the bank at the time he signed the renewal, but he signed the renewal because he was afraid Barvié would sue him otherwise.

In addition to the inventory and good will of the gas station, Broadus also pledged three properties located in Gulfport as security for the 2010 note: 2325 Middlecoff Drive; 344 Cowan Lorraine Rd; and #8 Hartford Place. (Exh. P-2). Barvié testified that Broadus represented to him that these properties were unencumbered and that he and Broadus had discussed including Broadus's home as collateral, but Broadus informed him that only his wife was on the title to their home. Broadus testified that Barvié was aware that the properties were encumbered because he discussed the equity he had in each property with Barvié and Barvié knew the Middlecoff property was encumbered because Barvié was living there at the time. He also testified that the mortgages on the three properties were all recorded. Barvié testified that he did not do a title search on any of the three pledged properties because he believed Broadus was being truthful about the lack of encumbrances. Broadus made cash payments in accordance with the terms of the 2010 note, but did not make the balloon payment in October of 2010. (Exh. D-1). He did continue to make monthly payments through July of 2011 and one other payment of $2,000.00 in December of 2011 before his payments ceased altogether. (*Id.*).

Barvié and Brodus discussed another renewal of the note and security agreement in late 2011 or early 2012. Barvié testified that he and Broadus discussed adding, as additional collateral to secure the renewal, Broadus's BP claim up to the total amount owed and Broadus's interest in a home located in Mobile, Alabama. Barvié drafted a new note and security agreement, which would have granted Barvié a 50% interest in the compensation Broadus received from his BP claim. (Exhs. D-7, D-8). Broadus never signed the new loan documents and testified that he had been advised by independent counsel not to do so. Barvié testified that he filed suit against Broadus and Broadus Petroleum[8] in April of 2012 and obtained a judgment in excess of $300,000.00, which has not been collected on.

## C.   Sale of Broadus's Leasehold Interest in the Gas Station

Unbeknownst to Barvié, Broadus assigned his leasehold interest in the gas station to Ali Hamid on May 11, 2011.[9] Hamid's testimony and the closing statement prepared by William Whitfield indicate that Hamid paid a total of $115,533.00 for Broadus's interest in the gas station. (Exhs. P-4; P–17 at 23–24). Whitfield testified that Broadus provided him with the information included in the closing statement. (Exh. P-17 at 24). The closing statement indicates that Hamid was to pay $7,074.60 on Broadus's behalf to Mississippi Commercial Properties, LLC; $40,533.40 on Broadus's behalf to Hallmark Petroleum; $20,000.00 to Broadus personally in accordance with a promissory note; $40,000.00 in the form of two cashier's checks paid to Broadus at the time of the sale; and $7,925.00 to Broadus in cash at the time of the sale. (Exh. P-4). Hamid testified that he made all of these payments. He also testified that he negotiated the

---

[8] (Exh. D-26).

[9] (Exhs. P-9, D-10). Barvié testified that he learned about the transfer when he walked into the store looking for Broadus and was told by an employee that Broadus no longer owned the business.

deal with Broadus directly and that Broadus never made him aware of any security interest Barvié may have had in the gas station inventory or good will.

Broadus testified that some of the proceeds from the sale of the gas station were used to make the monthly payments to Barvié, but he did not tell Barvié he sold his interest in the gas station and he did not pay him any of the proceeds from the sale, aside from those proceeds that were used to make his monthly payments. He also testified that he intended to repay Barvié in full; he knew Barvié had an interest in the good will and the inventory of the store; and that he chose to use the proceeds from the sale to pay vendors and a cash advance his wife took out on her credit card instead of using them to pay down his loan from Barvié.

Barvié commenced this proceeding and seeks to have the remaining unpaid balance under the 2010 Renewal—$292,625.08—plus all accrued interest and reasonable attorney's fees declared non-dischargeable. (Adv. Dkt. No. 63).

### III. CONCLUSIONS OF LAW

**A.   Burden of Proof**

A debtor is generally granted a discharge of all prepetition debts in a chapter 7 bankruptcy case, with the exception of certain debts described in § 523(a). *Bandi v. Becnel (In re Bandi)*, 683 F.3d 671, 674 (5th Cir. 2012) *cert. denied,* 133 S. Ct. 845 (2013). The Fifth Circuit has stated that "[e]xceptions to discharge should be construed in favor of debtors in accordance with the principle that provisions dealing with this subject are remedial in nature and are designed to give a fresh start to debtors unhampered by pre-existing financial burdens." *In re Davis*, 194 F.3d at 573. In a proceeding under § 523, the party seeking a determination of non-

dischargeability bears the burden of proof by a preponderance of the evidence.[10] *Grogan v. Garner*, 498 U.S. 279, 287–88 (1991); Fed. R. Bankr. P. 4005. Requiring the party objecting to the dischargeability of a debt to "carry the burden of proof comports with the policy behind federal bankruptcy law which favors discharge in an effort to provide the debtor with a fresh start." *Rustin v. Rustin (In re Rustin)*, No. 04-50890-NPO, 2011 WL 5443067, at *7 (Bankr. S.D. Miss. Nov. 9, 2011) (*citing* 4 Collier on Bankruptcy ¶ 523.05 (16th ed. 2010)). In his complaint, Barvié seeks to have the remaining balance on the 2010 Renewal—$292,625.08 plus accrued interest at the contractual rate of 8%—in addition to attorney's fees declared non-dischargeable. (Adv. Dkt. No. 63 at 10). At trial, Barvié agreed to reduce the amount of his claim by $1,100.00 because he withdrew the remaining balance in another account, in which he and Broadus each had a 50% interest, and Broadus agreed to let him have his half of the money to apply towards the amount owed on the 2010 Renewal. (*see* Exh. D-18). Thus, Barvié seeks to have $291,525.08 plus accrued interest and attorney's fees declared non-dischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), (a)(6), or some combination thereof. Therefore, Barvié bears the burden of proving each of the required elements of 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), or (a)(6) by a preponderance of the evidence.

## B.   11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). "Section 523(a)(2)(A) encompasses three similar

---

[10] "A fact is proven by a preponderance of the evidence if the Court finds it more likely than not the fact is true." *Lanier v. Futch (In re Futch)*, No. 09-00144-NPO, 2011 WL 576071, at *16 (Bankr. S.D. Miss. Feb. 4, 2011) (*citing EPA v. Sequa Corp. (In re Bell Petroleum Servs., Inc.)*, 3 F.3d 889, 909–10 (5th Cir. 1993)).

grounds for non-dischargeability, all of which apply to 'debts obtained by frauds involving moral turpitude or intentional wrong.'" *In re Futch*, 2011 WL 576071, at *17 (*citing First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 813 (5th Cir. 1992)). The Fifth Circuit has recognized a distinction between the elements of proof required for false pretenses or false representation and those required for actual fraud. *AT&T Universal Card Servs v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001). This distinction "appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact." *ETRG Investors, LLC v. Hardee (In re Hardee)*, No. 11-60242, 2013 WL 1084494, at *12 (Bankr. E.D. Tex. Mar. 14, 2013) (*citing Bank of Louisiana v. Bercier (In re Bercier),* 934 F.2d 689, 692 (5th Cir.1991) ("[A debtor's] promise . . . related to [a] future action [that does] not purport to depict current or past fact . . . therefore cannot be defined as a false representation or a false pretense")).

## 1. Actual Fraud

A party objecting to discharge of a debt under § 523(a)(2)(A) for *actual fraud* must demonstrate that: (1) the debtor made representations; (2) the debtor knew the representations were false at the time they were made; (3) the representations were made with the intention and purpose to deceive the creditor; (4) the creditor actually and justifiably relied on the representations; and (5) the creditor sustained a loss as a proximate result of its reliance. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995). In this case, the Court finds that Barvié has not met the requirements for showing actual fraud under § 523(a)(2)(A) with respect to the 2010 Renewal.

### i. Whether Broadus made representations that he knew were false at the time they were made

Broadus made a false representation concerning his ability to repay. He specifically

testified that he knew he would not be able to repay the $297,000.00 in three months—either with new loan proceeds or proceeds from his BP claim—when he signed the 2010 Renewal. Nevertheless, he signed the renewal note and security agreement on August 3, 2010, promising to make the monthly payments as well as the balloon payment due on October 1, 2010. [11]

### ii.   Whether the representations were made with the intention and purpose of deceiving Barvié

Broadus testified that he signed the renewal documents specifically to avoid being sued. Thus, he promised to make the monthly payments as well as the balloon payment, knowing this promise was false, for the express purpose of avoiding a lawsuit. The Court finds that this clearly demonstrates an intention and purpose to deceive Barvié.

### iii.   Whether Barvié relied on Broadus's representations

Section 523(a)(2)(A) requires justifiable—not reasonable—reliance. *Field v. Mans*, 516 U.S. 59, 74–75 (1995). This standard "takes into account the knowledge and relationship of the parties themselves." *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh),* 973 F.2d 1454, 1459 (9th Cir. 1992). But "[t]he justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent or obvious or there are 'red flags' indicating such reliance is unwarranted." *Third Coast Bank v. Cohen (In re Cohen).* No. 12-1004, 2013 WL 4079369, at *12 (Bankr. E.D. Tex. Aug. 13, 2013) *(citing Manheim Auto. Fin. Servs, Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133–34 (Bankr N.D. Tex. 2005)). Moreover, "[a] person may be justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *In re*

---

[11] Further, Broadus testified that his initial plan was to borrow the money from Barvié on a short-term basis until he could obtain a longer-term loan from a bank. But, he also testified that he was advised by bank personnel that he would need 12 to 24 months of profit and asset history to qualify for a loan. The balloon payment was due six months after Broadus received the initial loan. (Exh. P-7).Thus, Broadus knew at the time he originally borrowed the money from Barvié that he would not be able to repay the note within six months as promised.

*Futch, No.* 09-01841-NPO, 2011 WL 576071, at *20 (Bankr. S.D. Miss. Feb. 4, 2011) (*citing Field v. Mans*, 516 U.S. 59, 70 (1995) (*quoting* The Restatement (Second) of Torts, § 537 (1976))). But, if "under the circumstances, the facts should be apparent to one of [the promisee's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning he is being deceived," reliance is not justified without further investigation. *In re Mercer,* 246 F.3d 391, 418 (5th Cir. 2001) (*quoting* Prosser, Law of Torts § 108, 718 (4th ed. 1971)). "Stated another way, unless the falsity of a misrepresentation is obvious, or unless there are 'red flags' that serve as a warning that he is being deceived, a person's reliance is justifiable." *Id.* (*citing In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001)).

Barvié did not justifiably rely on Broadus's promise of repayment because the original loan served as a red flag, which should have made the falsity of Broadus's promise to repay the 2010 Renewal within 3 months obvious to Barvié. In *Weeber v. Boyd (In re Boyd),* 322 B.R. 318 (Bankr. N.D. Ohio 2004), the court found that the creditor did not rely on the debtor's promise of repayment because the evidence showed that the creditor "had special knowledge of the [d]ebtor's financial situation and the possibility of nonpayment due to the fact that on a previous occasion he had loaned her money."[12] Moreover, when the creditor discovered that a lien could not be placed on the car he loaned the debtor money to purchase, instead of terminating the agreement, he continued with the transaction. *Id.* In finding that the creditor's reliance was not justifiable, the court quoted *Field v. Mans*, stating that a person "is required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him." *Id.* (*quoting Field,* 516 U.S. at 71).

---

[12] *Id.* at 326. *See also Winston-Salem City Employees' Fed. Credit Union v. Casper (In re Casper),* 466 B.R. 786, 794–95 (Bankr. M.D.N.C. 2012) (reliance was not justifiable where the creditor continued to assign the titles of vehicles to the debtor after the debtor failed to pay for vehicles twice in a row); *Stastny v. Sedivec (In re Sedivec),* 396 B.R. 31, 34 (Bankr. N.D. Iowa 2008) (reliance was not justifiable where the plaintiff ignored red flags, including not being present at the closing and not being part of the real estate contract though she claimed she was supposed to receive an ownership interest in the home).

Similarly, in this case the original promissory note and security agreement provided that the loan would be paid within six months. (Exh. D-3). Both Broadus and Barvié testified that the loan was to cover Broadus until he could obtain financing from a bank, at which point he would use funds from that loan to make the balloon payment to Barvié. Indeed, the balloon payment was due by January 30, 2007. (*Id.*). But the renewal was not executed until August of 2010—more than three years after the original balloon payment was due. (Exh. P-1). And in 2009, Barvié agreed to allow Broadus to skip his March, April, and May payments and accepted a payment reduced by $718.00 for the remainder of 2009. (Exh. D-5). Thus, Barvié was well aware of Broadus's inability to fully repay him without additional financing. And Barvié was further aware that Broadus had been unable to obtain permanent financing for nearly 4 years. Moreover, Barvié knew that nothing in Broadus's financial circumstances had changed when the 2010 Renewal was signed: he still had not obtained outside financing and it was unlikely he could do so or recover on his BP claim within three months. The Court therefore finds that Barvié should have been aware that Broadus's promise to repay the debt fully within 3 months was false, and therefore he could not have justifiably relied upon it.

Moreover, Barvié failed to establish that he actually relied upon Broadus's promise to repay the debt by October 2011. Barvié allowed Broadus to continue making monthly payments after executing the 2010 Renewal well after the October deadline for the balloon payment had passed. (Exh. D-1). And he accepted payments reduced by $118.00 from July of 2011 through December of 2011. (*Id.*). Barvié testified—and Broadus does not dispute—that the payments ceased entirely after December 2011. But Barvié did not attempt to foreclose on the collateral pledged in the 2010 Renewal, which he also never perfected his interest in. Instead, in February of 2012, Barvié was willing to sign yet another renewal, which would have included half of Broadus's BP claim as collateral. (Exh. D-6). Thus, the Court is unconvinced that Barvié actually relied on Broadus's promise to repay the entire debt within three months as promised in the 2010 Renewal.

### 2. False Pretense or False Representation

Under § 523(a)(2)(A), a representation made by a debtor is a false pretense or false representation if it was: (1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party. *In re Mercer,* 246 F.3d 391, 403 (5th Cir. 2001); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir. 1995).

### i. A Knowing and Fraudulent Falsehood Describing Past or Current Facts

Barvié testified that Broadus represented to him that the three properties he pledged as additional collateral for the 2010 Renewal were unencumbered, which is why those three properties—out of the several owned by Broadus—were chosen as collateral. Broadus testified that Barvié knew the properties were encumbered because he told them how much "equity" he had in each and that Barvié specifically knew that the property located at Middlecoff Drive was encumbered because Barvié lived there. Broadus further testified that all of the mortgages on the properties were a matter of public record that Barvié could have easily discovered. Barvié testified that he did not run title searches on the three properties because he believed Broadus was telling him the truth about the lack of encumbrances. The Court is persuaded by Broadus's testimony, particularly because Barvié lived in one of the properties pledged as collateral, and it is likely he knew of the encumbrance. But, even assuming Broadus represented to Barvié that these properties were unencumbered, Barvié did not justifiably rely on such a representation.

### ii. Reliance

Though the Fifth Circuit recognizes a temporal distinction between actual fraud and false pretenses or false representation, the same justifiable reliance standard applies to any action arising under § 523(a)(2)(A). *See generally AT&T Univ. Card Servs v. Mercer (In re Mercer),* 246 F.3d 391 (5th Cir. 2001); *Field v. Mans,* 516 U.S. 59, 73 (1995). Thus, unless the falsity of

the representation should have been obvious to Barvié or a red flag was present, his reliance was justifiable. The Court finds that the falsity of Broadus's representation should have been obvious to Barvié and there was a red flag, triggering a duty to further investigate.

First, Broadus testified—and Barvié did not dispute—that Barvié was residing in one of the properties pledged as collateral. Broadus also testified that Barvié knew that his rent payments were going towards the mortgage on that home. Thus, even assuming Broadus represented that the property was unencumbered, the falsity of that representation should have been obvious to Barvié. Second, Barvié's prior dealings with Broadus concerning this specific loan served as a red flag, triggering a duty to investigate. And, had Barvié made the barest investigation in the form of a title search on the properties pledged as collateral, he would have discovered the falsity of Broadus's representation.

Moreover, Barvié failed to show he actually relied on Broadus's representation. In *Cmty. Fed. Credit Union v. Straughter (In re Straughter),* 219 B.R. 672 (Bankr. E.D. Pa. 1998), the court held that it could not find justifiable reliance where the creditor relied on its prior business dealings with the debtor rather than the information in his written request for funding, which stated that his company had more than $400,000.00 in potential clients or contracts, though the company was not operational at the time. *Id.* at 676. The non-operational status of the company would have easily been discovered through minimal investigation. *Id.* Similarly, in this case it appears that Barvié relied on his friendship with Broadus rather than his security interest in the rental homes when he signed the 2010 Renewal.[13] And the falsity of Broadus's statement could have easily been uncovered. Accordingly, the Court finds that Barvié has not met the requirements of § 523(a)(2)(A) and turns now to Barvié's claims under § 523(a)(2)(B).

---

[13] Barvié never obtained a Deed of Trust on any of the properties and was willing to execute a new renewal in 2012.

## C.  11 U.S.C. § 523(a)(2)(B)

Under § 523(a)(2)(B),[14] debts obtained by "a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied are excepted from discharge." *In re Bandi*, 683 F.3d at 674–75. This exception to discharge only applies to statements respecting either the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(B); *In re Bandi*, 683 F.3d at 674. Recently, the Fifth Circuit instructed that the term "financial condition," as used in § 523(a)(2), must be narrowly interpreted. *See In re Bandi*, 683 F.3d at 676 (false representation that debtors owned property was not statement respecting their "financial condition," thus § 523(a)(2)(A) applicable rather than § 523(a)(2)(B)). The Court of Appeals explained that "the term was meant to embody terms commonly understood in commercial usage"—"the general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities." *Id.*

Barvié failed to adduce any evidence at trial indicating he relied on a materially false written statement regarding Broadus's financial condition. The evidence instead established that, at best, Broadus made oral representations that he owned certain rental properties, which were pledged as collateral for the 2010 Renewal, free and clear of any liens. Section § 523(a)(2)(B) expressly requires "a statement in writing." 11 U.S.C. § 523(a)(2)(B). Further, the Fifth Circuit

---

[14] Section 523(a)(2)(B) provides:

> (a) A discharge under section 727. . . of this title does not discharge an individual debtor from any debt--
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
> (B) use of a statement in writing--
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive

11 U.S.C. § 523(a)(2)(B).

explicitly held in *Bandi* that a misrepresentation regarding property ownership is not a statement respecting the debtor's financial condition within the meaning of § 523(a)(2)(B). *Bandi*, 683 F.3d at 676. Accordingly, the Court finds that Barvié failed to establish the elements of § 523(a)(2)(B) and turns now to § 523(a)(4).

## D.   11 U.S.C. § 523(a)(4)

Debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are excepted from discharge. 11 U.S.C. § 523(a)(4). "Fiduciary" within the meaning of § 523(a)(4) "is construed narrowly, limited to 'technical trusts' and to traditional fiduciary relationships involving 'trust-type' obligations imposed by statute or common law." *FNFS, Ltd & B&W Fin. Co., Inc. v. Harwood (In re Harwood)*, 637 F.3d 615, 619–20 (5th Cir. 2011). Barvié does not appear to allege Broadus was acting in a fiduciary capacity. But the phrase "while acting in a fiduciary capacity does not qualify the words 'embezzlement' or 'larceny,'" thus "any debt resulting from embezzlement or larceny falls within the exception of clause (4)." *Advanced Recovery Sys. v. Clemons (In re Clemons)*, No. 1100127EE, 2013 WL 828282, at *12 (Bankr. S.D. Miss. March 6, 2013) (*quoting* 4 Collier on Bankruptcy ¶ 523.10[1][2] (Alan N. Resnick & Henry J. Somme reds., 16th ed.)).

Embezzlement requires a "showing that [the creditor] entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996). The creditor must also prove "the debtor's fraudulent intent in taking the property." *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602–03 (5th Cir. 1998), *cert. denied*, 526 U.S. 1016 (1999). Larceny is the "fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner.

As distinguished from embezzlement, the original taking of the property must be unlawful." 4 Collier on Bankruptcy at ¶ 523.10[2] (footnote omitted).

Barvié failed to adduce any evidence at trial establishing the elements of either larceny or embezzlement. Both Broadus and Barvié testified that the loan proceeds were used to purchase Broadus's interest in the gas station, which is the use contemplated in the original note and security agreement. (Exh. P-7). Thus, the loan proceeds were not used for a purpose other than that for which they were intended, which prevents a finding of embezzlement. And both parties agree that Broadus did not take the money from Barvié unlawfully, which prohibits a finding of larceny. Accordingly, Barvié failed to meet the requirements of § 523(a)(4) and the Court now turns to his claims under § 523(a)(6).

### E.   11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Accordingly, to render a pre-petition debt non-dischargeable under § 523(a)(6), the plaintiff must establish three elements: (1) the debtor caused an injury; (2) the injury was incurred by another (or the property of another); and (3) such injury was willful and malicious. *Whitney Nat'l Bank v. Phillps (In re Phillips),* No. 09-00033-NPO, 2010 WL 5093388, at *6 (Bankr. S.D. Miss. Dec. 8, 2010). In *Kawaauhau v. Geiger*, the Supreme Court held that the word "willful" in § 523(a)(6), "modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). And "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64. The Fifth Circuit has held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective

motive to cause harm." *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598, 606 (5th Cir. 1998).[15] Stated differently, "for willfulness and malice to prevent discharge under Section 523(a)(6), the debtor must have intended the actual injury that resulted. . . . Intent to injure may be established by showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury." *Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998) (citing *In re Delaney*, 97 F.3d 800, 802 (5th Cir. 1996)).

In this case, Broadus testified that he understood Barvié had a security interest in both the good will and the inventory of the gas station. Nevertheless, he sold his interest in the gas station without informing Barvié and without turning over the proceeds of the sale that were paid for the good will and inventory to Barvié. Instead, Broadus testified that he elected to use the money he received from the sale to pay off inventory creditors and a credit card cash advance his wife had taken out. The Court finds that these actions either necessarily caused, or were substantially certain to cause, the injury suffered by Barvié. Accordingly, Barvié has met the requirements of § 523(a)(6). To the extent Broadus misapplied the proceeds of the sale of his interest in the good will and inventory of the gas station, which was pledged as collateral and should have gone to Barvié, the misappropriated proceeds constitute a non-dischargeable debt within the meaning of § 523(a)(6). *See Westwood Square Ltd. P'ship v. Broome (In re Broome),* No. 11-50528, 2014 WL 61235 (Bankr. S.D. Miss. Jan. 8, 2014) (finding that expenses not applied as promised constituted non-dischargeable debt under § 523(a)(2)(A)).

Broadus sold his interest in the gas station for a total of $115,533.00. (Exh. P-3). According to the closing statement, which William Whitfield prepared at Broadus's request, the inventory was purchased for $24,727.38; the good will was purchased for $50,000.00; and the

---

[15] The *Miller* court specifically rejected the argument that a "malicious" act is one without just cause or excuse, opting instead to adopt the "implied malice standard," which defines a "malicious" act as one done with the "actual intent to cause injury." *Id.* at 605–06.

gas inventory was purchased for $40,805.62. (*Id.*). Apparently at Broadus's request, the purchaser—Ali Hamid—paid a total of $67,925.00 directly to Broadus, and he paid Mississippi Commercial Properties $7,074.60 and Hallmark Petroleum $40,533.40 directly on Broadus's behalf. (*Id.*).

Hamid testified that it is common for petroleum suppliers to deliver gas on credit, and collect payment within 7–10 days of delivery, which is why he paid Hallmark Petroleum directly for the gas inventory already present in the tanks. Thus, the gas inventory had not yet been paid for when Hamid purchased Broadus's interest in the gas station. He further testified that Broadus informed him he was behind on rent and Hamid agreed to take on that responsibility as well, which is why he paid Mississippi Commercial Properties directly on Broadus's behalf. Instead of paying Barvié the proceeds from the sale of the good will and inventory pledged as collateral, Broadus elected to direct those proceeds towards payment elsewhere, including the payment of a cash advance his wife had taken out on her credit card.[16] Accordingly, the Court finds that the amount Hamid paid for the inventory and good will of the gas station—$74,727.38 according to the closing statement—is non-dischargeable and turns now to Broadus's argument under Mississippi Rule of Professional Conduct 1.8.

## F.   Rule 1.8

Broadus argues that the 2010 note and security agreement should be invalidated because Barvié violated Mississippi Rule of Professional Conduct 1.8 ("Rule 1.8"). (Adv. Dkt. No. 135 at 9). For support, he relies on a Ninth Circuit Bankruptcy Appellate Panel case, *Wagner Choi & Evers v. Woo (In re Worldpoint Interactive, Inc.)*, No. HI-04-1172-MoRB, 2005 Bankr. LEXIS 3378 (B.A.P. 9th Cir. June 28, 2005). *Wagner* is not binding precedent. Moreover, *Wagner* is

---

[16] Broadus did testify that part of the money may have gone towards payments he made to Barvié under the 2010 Renewal, but he failed to state what portion of the payments he made, if any, came directly from the proceeds he received for the sale of the collateral, and he did testify that he never voluntarily notified Barvié of the sale.

distinguishable from the current case in several important respects: the attorney in *Wagner* never explained the terms of the agreement; did not advise the parties to seek independent counsel; did not give the parties the opportunity to seek the advice of independent counsel; and did not give the parties copies of the agreement they signed. *Id.* at *7. Here, Broadus testified that he understood the terms of both the original and renewal loans and received copies of both sets of documents. Further, Barvié testified that Broadus took both sets of documents with him for a period of time and then returned with them and signed them at Barvié's office. He also testified that Broadus mentioned a desire to have professionals, including attorneys and accountants, review the documents before he signed them. Thus, Broadus had ample opportunity to consult outside counsel before signing the loan documents.

Further, even if the Court were to find *Wagner* persuasive, there has not been a violation of Rule 1.8 in this case. Rule 1.8(a) states:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or pecuniary interest adverse to a client unless:
>
>> (1) the transaction and terms on which the lawyer acquires the interests are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>>
>> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>>
>> (3) the client consents in writing thereto.

Miss. R. Prof. Cond. 1.8(a).   Rule 1.8 is based on Rule 1.8 of the ABA Model Rules of Professional Conduct ("ABA Rule 1.8"). ABA Rule 1.8(a) states:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

ABA Model R. Prof. Cond. 1.8(a). The language of both rules is very similar, but—notably—Rule 1.8 does not require the attorney to advise the client of the desirability of seeking independent counsel "in writing," as required by ABA Rule 1.8. In fact, Rule 1.8 does not appear to require the attorney to advise the client to seek the advice of independent counsel. Rather, Rule 1.8 simply requires that the attorney give the client the opportunity to do so. And Rule 1.8 merely requires the client to consent to the terms of the agreement in writing while ABA Rule 1.8 requires the client to give informed consent, in writing, to the essential terms of the agreement as well as the attorney's role in the transaction. In this case, the 2010 Renewal was in writing, Broadus testified that he understood the terms of the agreement, and Broadus took the documents with him for a period of time before returning to Barvié's office to sign them, indicating he had ample opportunity to confer with independent counsel before signing the agreement. Accordingly, the Court finds that Barvié did not violate Rule 1.8.[17]

## G. Damages

The Court has already found that the proceeds from the sale of the inventory and good will created a non-dischargeable debt pursuant to § 523(a)(6). Barvié also seeks interest at 8%—the contract rate—and an award of reasonable attorney's fees. In *Cohen v. Cruz*, 523 U.S. 213

---

[17] Moreover, even if Barvié had violated Rule 1.8, his violation "should not give rise to a cause of action. . . . The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability." Miss. R. of Prof. Conduct Scope.

(1998), the Supreme Court held that the scope of damages determined non-dischargeable under § 523(a)(2)(A) may extend beyond the value of the funds obtained by fraud to encompass "all liability arising from fraud." *Id.* at 215. Thus, Barvié is entitled to damages beyond the proceeds from the sale of the good will and inventory of the gas station to the extent they arose from Broadus's fraudulent actions.

First, with respect to Barvié's request for post-judgment interest at his contract rate, he is entitled to interest at the federal judgment rate pursuant to 28 U.S.C. § 1961—not his contractual rate of 8%—from the date of entry of this order and opinion until the debt is paid in full.

Next, to the extent Barvié requests pre-judgment interest, it is ultimately within the discretion of the Court to determine whether he is entitled to it. *Williams v. Trader Pub. Co.,* 218 F.3d 481, 488 (5th Cir. 2000). And "[t]he determination of whether pre-judgment interest should be awarded requires a two-step analysis: does the federal act creating the cause of action preclude an award of pre-judgment interest" and "does an award of pre-judgment interest further the congressional policies of the federal act." *Turbo Aleae Inv., Inc. v. Borschow (In re Borschow),* 454 B.R. 374, 403 (Bankr. W.D. Tex. 2011) (*quoting Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't. Stores, Inc.* 15 F.3d 1275, 1288 (5th Cir. 1994)). Section 523(a)(2) does not preclude an award of pre-judgment interest, and the "intent of § 523(a)(2) is to prevent a debtor from discharging a loan obtained by fraud." *Id.* at 404. Thus, it would appear that an award of pre-judgment interest would further the congressional policies of § 523(a)(2). Further, "[r]efusing to award prejudgment interest ignores the time value of money and fails to make the Plaintiff whole." *Thomas v. Tex. Dep't. of Crim. Justice*, 297 F.3d 361, 372 (5th Cir. 2002). Thus, the Court is persuaded that an award of pre-judgment interest is appropriate in this case. Turning to the appropriate rate to award, where no federal statute governing pre-judgment interest exists, courts should look to state law for guidance as to the

appropriate rate. *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 984–85 (5th Cir. 1991), *abrogated on other grounds*, 683 F.3d 182 (5th Cir. 2012); *In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 684–85 (Bankr. S.D. Tex. 2009). Mississippi law provides that "[a]ll judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered." Miss. Code. Ann. § 75-17-7. Accordingly, the Court finds that a pre-judgment award of interest at the 8% contract rate accruing as of August 3, 2010—the date of the 2010 Renewal—is appropriate and necessary to make Barvié whole. And the Court finds that the 8% interest rate should only apply to the $74,727.38 that is non-dischargeable.

Last, with respect to Barvié's request for attorney's fees, "'prevailing creditors still have no *statutory* right to attorney's fees' because § 523(d) only gives prevailing debtors a right to attorney's fees," but creditors still have "the *contractual* right to attorney's fees . . . when that right arises from a contract between the creditor and the debtor . . . ." *Matter of Luce*, 960 F.2d 1277, 1286 (5th Cir. 1992) (emphasis in original) (*quoting Martin v. Bank of Germantown (In re Martin)*, 761 F. 2d 1163, 1168 (6th Cir. 1985)). The 2010 renewal Broadus signed contains an attorney's fees provision. (Exh. P-1, at ¶6 (E)). Thus, Barvié is contractually entitled to reasonable attorney's fees.

## IV. CONCLUSION

For the reasons stated above, the Court finds that Broadus's obligation on the 2010 renewal is non-dischargeable in part in the amount of $74,727.38 plus pre-judgment interest at the contract rate of 8%, accruing from August 3, 2010, and post-judgment interest at the federal judgment rate until paid as well as reasonable attorney's fees.

**THEREFORE IT IS ORDERED AND ADJUDGED** that, pursuant to 11 U.S.C. § 523(a)(6), the debt owed to Barvié by Broadus is not dischargeable in the amount of $74,727.38 and Barvié's request for attorney's fees and costs is **GRANTED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Robert Schwartz shall file within 14 days of the date of the entry of this opinion a fee itemization for prosecuting the adversary proceeding so that the Court may enter final judgment.

## END OF OPINION ##